**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TAMMY TAPIA-MATOS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff(s),<br><br>v.<br><br>CAESARSTONE SDOT-YAM, LTD., YOSEF SHIRAN, and YAIR AVERBUCH,<br><br>Defendants. | **No.: 1:15-cv-06726-JMF**<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiffs Anthony Lanza, Ruth Lanza, Johnson Yang, Micro World Corp., and Mark Pawlitschek ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters based on the investigation conducted by and through their attorneys, that included, among other things, a review of Securities and Exchange Commission ("SEC") filings by CaesarStone Sdot-Yam, Ltd. ("CaesarStone" or the "Company"), Company press releases, media and reports about the Company. Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons and entities, other than defendants, who purchased the securities of CaesarStone between February 12, 2014 and August 18, 2015, inclusive (the "Class Period"). Lead Plaintiffs seek to recover damages caused

by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its officers and/or directors and various persons who improperly made materially false and misleading statements.

2. Throughout the Class Period, Defendants made false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects, with each intended to artificially inflate the price of CaesarStone stock.

3. Defendants' false or misleading statements concerned two distinct areas: financial reporting and quality control. First, with respect to financial reporting, the Company's annual report for 2014 falsely stated that the price of quartz, the primary material used in the manufacture of the Company's products, increased by only 4% that year when in fact the Company had incurred price increases of approximately 19%.

4. Next, Defendants' disclosures of CaesarStone's margins for each quarter of 2014 and for the full year were overstated and materially false or misleading, due to their misstatement of the cost of goods sold, specifically as related to the increased price of quartz.

5. Finally, regarding quality control, Defendants repeatedly and misleadingly or falsely misrepresented the percentage of quartz in its products. Defendants, who tout CaesarStone's products as "premium," claim that the Company's products contain 93% quartz. In fact, independent testing demonstrates that CaesarStone's countertops contain a significantly lower percentage of quartz than advertised, and contrary to Defendants' premium-status claims, were virtually identical to products sold by the Company's competitors.

6. On August 19, 2015, analyst firm Spruce Point Capital Management ("Spruce Point") published a report alerting investors of the aforementioned false and misleading statements and disclosure failures by CaesarStone.

7. On this news, CaesarStone ADRs fell $3.68, or 7.6%, to close at $44.61 on August 19, 2015, at an unusually high volume of 4.35 million shares.

8. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiffs and the other class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act, and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

10. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa(a) and 15 U.S.C. §78aa(b)(1) and (2)) and 28 U.S.C. § 1331.

11. Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b)(3) and §1391(c)(3).

12. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13. Lead Plaintiffs Anthony Lanza, Ruth Lanza, Johnson Yang, Micro World Corp., and Mark Pawlitschek purchased CaesarStone securities at artificially inflated prices during the

Class Period and suffered damages as set forth in the certification previously filed with the Court and incorporated by reference herein.

14. Defendant CaesarStone is an Israeli corporation with its principal executive offices located at Kibbutz Sdot-Yam, MP Menashe, 37804, Israel. CaesarStone's ADRs trade on the NASDAQ under the ticker symbol "CSTE."

15. Defendant Yosef "Yos" Shiran ("Shiran") served at all relevant times as the Company's Chief Executive Officer and Executive Director.

16. Defendant Yair Averbuch ("Averbuch") served at all relevant times as the Company's Chief Financial Officer and Executive Director.

17. Defendants Shiran and Averbuch are referred to as the "Individual Defendants." Together the Individual Defendants and Company Defendant are referred to as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### a. Background

18. CaesarStone manufactures and sells engineered quartz surfaces under the CaesarStone brand in the United States, Australia, Canada, Israel, and Europe. The Company produces engineered quartz slabs, fabricated by outside contractors to be used as kitchen countertops, vanity tops, wall panels, back splashes, floor tiles, stair, and other interior surfaces used in residential and non-residential spaces. It sells its products directly to fabricators, sub-distributors, and resellers; and indirectly through a network of independent distributors.

19. The company was founded in 1987 and is based in Israel. Until 2015 its majority stockholder was Kibbutz Sdot-Yam ("Sdot-Yam"), which leases land and provides employees to the Company. CaesarStone Sdot-Yam Ltd. is a subsidiary of Mifalei Sdot-Yam Agricultural Cooperative Society Ltd.

**b. <u>CaesarStone Conceals Increases In The Price of Quartz</u>**

20. The primary component in CaesarStone's products is quartz, a vast majority of which is imported from Turkey. According to CaesarStone's 2013 Annual Report, Form 20-F, filed on May 14, 2014 ("2013 20-F"), which was signed by Defendant Shiran, in 2013, 72% of CaesarStone's quartz was imported from Turkish suppliers. According to CaesarStone's 2014 Annual Report, Form 20-F, filed on March 12, 2015 ("2014 20-F"), also signed by Shiran, in 2014, 67% of CaesarStone's quartz came from Turkish suppliers.

21. The Company purchased the largest share of its Turkish quartz from one supplier, Mikroman Madencilik ("Mikroman"). According to CaesarStone's 2012 Annual Report, Form 20-F, filed on March 25, 2013 ("2012 20-F"), signed by Defendant Shiran, in 2012, 55% of all of the quartz purchased by the Company from all sources came from Mikroman. In 2013, 48% of all of the quartz purchased by the Company from all sources and countries came from Mikroman. 2013 20-F. In 2014, that number remained essentially the same, at 46%. 2014 20-F.

22. CaesarStone does not have long-term supply contracts with its suppliers, including Mikroman, nor is it obligated to purchase set amounts in a particular year from any single supplier. Instead it executes purchase orders as needed. 2013 20-F, 2014 20-F. The Company admits that the price it pays for quartz is subject to the vagaries of supply and demand, and that the "increasing global demand for quartz" has pushed prices upwards. 2014 20-F.

23. In its 2014 20-F, CaesarStone claimed that it only paid 4% more for quartz in 2014 than in 2013, stating "[w]e do not have long-term supply contracts with our suppliers of quartz. The price of quartz was relatively stable during the last few years, but in 2014 and recently when renewing our annual supply terms for 2015 with certain Turkish quartzite

suppliers, we experienced an increase of approximately 4% in quartzite prices each year, which we believe was driven by increasing global demand for quartz."

24. Contrary to Defendants' statements, CaesarStone's own documents and admissions belie its claim that quartz prices increased by only 4% in 2014. A comparison of supply agreements reveals that in actuality, the price of quartz grew by nearly 19% in 2014. According to a February 6, 2012 supply agreement between the Company and Mikroman, signed by Defendant Yos Shiran, CaesarStone paid Mikroman $143 per ton of quartz in 2012 and 2013 ("2012 price agreement").[1] However, the price for quartz in 2014, set forth in a December 19, 2013 supply agreement, again signed by Defendant Shiran, was considerably higher, at $170 per ton of quartz ("2014 price agreement").[2] This represents a total increase of 19%.

25. Furthermore, the entirety of the 19% increase occurred in 2014. In the 2012 20-F, the Company states that "Mikroman has committed to supply us with quartzite at agreed upon prices through the end of 2013 and, thereafter, at prices that will be agreed upon based on then effective market prices through the end of 2014." Since the "agreed upon" cost per ton was $143 in 2012, then the cost per ton was $143 in 2013. Therefore, the entirety of the $27 increase in price per ton occurred in 2014.

26. Confirming the stability of the price of quartz through 2013, during a May 8, 2013 earnings conference call, Defendant Shiran responded to an analyst's inquiry concerning changes in raw material outlook by stating: "In terms of raw materials, we don't see any major changes."

27. Thereafter, during a February 12, 2014 earnings conference call to discuss the results of the fourth quarter of 2013 ("Q4 2013 Earnings Call"), in response to an analyst's question CEO Shiran acknowledged that the cost of quartz had not increased in 2013, but was

---

[1] The 2012 price agreement is appended to the Amended Complaint as Exhibit A.
[2] The 2014 price agreement is appended to the Amended Complaint as Exhibit B.

increasing in 2014, stating that "[a]s to raw materials, there is some increase in quartz prices. And from time-to-time, we didn't experience so much this year [2013] but in the past we experienced also a full year price increase."

28. During the same earnings call, CFO Averbuch acknowledged that prices had increased in 2014. Responding to an analyst's question asking for "negative impacts" that would affect margin in 2014, Averbuch cited "raw material price increases mostly in the quartz or due to the significant demand there are price increases."

29. The "prices that will be agreed upon based on then effective market prices through the end of 2014" reflects the increase in global demand and the end of Mikroman's commitment to sell quartz to CaesarStone at $143 per ton. The Company admitted as much in its 2013 20-F, stating that "the price of quartz was relatively stable during the last few years, but recently we have experienced an increase when renewing our annual supply contracts for 2014 with the Turkish quartzite producers given the increasing global demand for quartz."

30. This "increased global demand" resulted in increases in the price of quartz across the board, and not just from any one particular supplier. Notably, even though Caesarstone was not locked into purchasing a set amount of quartz per year from Mikroman, the Company continued to obtain almost 50% of its total quartz supply exclusively from this one supplier. Indeed, Mikroman remained the Company's largest worldwide supplier in 2012, 2013, and 2014.

31. Given the Company's ability to execute purchase orders with whoever it wants, whenever it wants, and the lack of a binding commitment to purchase a set amount of quartz during the year from any one supplier, CaesarStone only would have agreed to pay the 19% price increase to Mikroman, because no cheaper alternative suppliers were available.

**c. <u>CaesarStone Overstates its Margins</u>**

32. CaesarStone materially understated the cost of goods sold in 2014, because it materially understated the increase in the cost of quartz by a factor of almost five. As a result, its margins are materially misstated.

33. CaesarStone acknowledged the impact of an increase in raw material costs on margins. In its 2013 20-F, the Company stated that "our cost of sales and overall results of operations are impacted significantly by fluctuations in quartz prices."

34. On May 8, 2014, CaesarStone filed a form 6-K and issued a press release announcing its Q1 2014 financial results. The press release quoted Defendant Shiran making positive statements regarding the Company, while failing to acknowledge the 19% increase in quartz costs, stating that the year-over-year decline in Q1 margins from 44.5% to 41.8% was driven by quartz price increases only "to a lesser extent."

35. On May 8, 2015, CaesarStone held its Q1 2014 Earnings Call, during which CFO Averbuch stated that the decrease in margin was driven by higher quartz prices only "to a lesser extent."

36. On August 6, 2014, CaesarStone held its Q2 2014 Earnings Call, during which CFO Averbuch again downplayed the effect of the raw material price increase, stating that this drove the decrease in margin, which suffered a year-over-year decline in Q2 margins from 49.8% to 41%, only "to a lesser extent."

37. On August 7, 2014, CaesarStone filed a form 6-K and issued a press release announcing its Q2 2014 financial results, with Shiran again discussing margin. Consistent with the Company's understating the cost of goods sold, Shiran downplayed the role of the quartz

price increase, stating that the lower margins were due only "to a lesser extent, [to] raw material price increases…."

38. On November 5, 2014, CaesarStone filed a form 6-K and issued a press release announcing its Q3 2014 financial results. CEO Shiran again downplayed the impact of the 19% increase the company refused to recognize publicly, stating that the lower margins, which suffered a year-over-year decline in Q3 from 44.5% to 43.7%, were affected by the rise in quartz prices only "to a lesser extent."

39. On November 9, 2014, CaesarStone held its Q3 2014 Earnings Call, during which CFO Averbuch once gain downplayed the effect of the raw material price increase, stating that this drove the decrease in margin from the same quarter in the previous year only "to a lesser extent."

40. On February 12, 2015, CaesarStone filed a form 6-K and issued a press release announcing both its Q4 2014 and FY 2014 financial results. Again quoting Defendant Shiran, the Company again minimized the effect of the large, unacknowledged increase in the price of quartz on margins, stating that margins were unchanged from the same quarter a year earlier due, "to a lesser extent, higher quartz prices," and stating that the price increase for quartz did not play a large role in the decline in margin for the entirety of 2014.

41. During the Q4 2014 Earnings Call, Defendant Averbuch acknowledged the increase in the price of quartz, though not the true 19% increase, but downplayed the effect on margin, which remained at 43% year-over-year for Q4, stating that "quartz prices went up and that caused around less than 60 basis points impact on gross margin for Q4."

42. In its 2014 20-F, the Company provided reasons for reduced margins in 2014, but omitted any mention of an increase in the price of quartz as a cause, much less a 19% increase.

Instead, it stated: "[i]n 2014, gross profit margins decreased mainly due to unfavorable exchange rates, increased IKEA business related to fabrication and installation activities, which comes with lower gross margin and a non-recurring $3.5 million credit to cost of revenues from 2013."

**d. <u>CaesarStone Misstates the Quartz Content in its Products</u>**

43. CaesarStone markets itself as a producer of "premium" quartz products. It uses this alleged distinction to charge higher prices than its competitors. Its strategy is laid out in its 2014 20-F, which states that the Company "seek[s] to position our products as a premium alternative to other surface materials and other quartz surfaces," and that "the perception among end-consumers of our products is a key competitive differentiator." Noting that competitors "set prices considerably lower than the prices of our premium products," CaesarStone acknowledges that it has "invested considerable resources to position our quartz surfaces as premium branded products." These exact statements are also found in the 2012 20-F and in the 2013 20-F.

44. One of the ways in which CaesarStone brands itself as "premium" is through the percentage of quartz in its products. Though in its SEC filings it claims that its products are between 90%-93% quartz, it holds its products out to the consumer as containing 93% quartz. CaesarStone's "Technical Data Manual," a glossy, color publication available on its website, states plainly in its "Product Description" that "CaesarStone is 93% crushed quartz," and later that the "Sustainable Composition of Product" is "93% quartz." CaesarStone's website is similarly unequivocal, reading that "CaesarStone quartz surfaces are the ultimate combination of nature and technology. CaesarStone surfaces consist of 93% crushed quartz." In a brochure prepared by the Company to boast of its "unique installation" at "Milan Design Week," CaesarStone again stated that its products contained "93% quartz."

45. CaesarStone tells its distributors that its products contain 93% quartz, and the distributors tout the 93% quartz composition on their websites. Creative InCounters, an independent distributor of CaesarStone products, tells consumers to "choose CaesarStone" because "CaesarStone is 93% natural Quartz." Sunset Granite tells its customers to choose CaesarStone for the same reason. American Marble & Granite, Inc. says with regards to all thirty-six CaesarStone products it sells that they are "[c]omprised of 93% natural quartz." S&W Kitchens states twice that all CaesarStone countertops contain 93% quartz. Finally, the same is true of Stone LA's website, where the consumer learns that "CaesarStone Quartz Surfaces are manufactured to an exacting standard of excellence…. [and contain] 93% natural quartz aggregates to 7% pigments and polymer resins." The same claim regarding the 93% quartz composition can be found on the websites of T&J Granite Countertops, Ortega Kitchen and Bath, StoneOne Marble and Granite, The Kitchen Source, IST Granite, Carey Custom Floors, Marble Masters, Kitchen Designs, Inc., bobvila.com, and many others.

46. Ikea sells CaesarStone products. In a CaesarStone flyer prepared for Ikea entitled "10 Reasons to Choose CaesarStone," "CaesarStone is 93% natural Quartz" is listed as the reason for the product's "Natural Beauty."

47. CaesarStone's "93% quartz" claim fails to hold up to scientific testing. Spruce Point purchased two separate samples of CaesarStone products directly from the Company, as well as materials from seven competitors, and submitted them all to Robert Horvath, Ph.D., of the Rutgers University Department of Materials Science & Engineering, for testing. Each sample was tested twice.

48. Rather than prove how the 93% quartz content leads to the "natural beauty" of the Company's "premium" product, the report, entitled "Analysis of Countertop Materials," revealed

the opposite.[3] Only one competitor's sample had a lower percentage of quartz than CaesarStone's products, and three of CaesarStone's competitors' products tested at very close to 93%. The two CaesarStone products contained 88.69% and 89.41% quartz, nowhere near the 93% claim CaesarStone makes to consumers to justify its attempts to "position our products as a premium alternative to other surface materials and other quartz surfaces."

## THE TRUTH EMERGES

49. On August 19, 2015, Spruce Point published its report alerting investors of the aforementioned false and misleading statements and the failures of disclosure by CaesarStone. On this adverse news, CaesarStone stock fell $3.68, or 7.6%, to close at $44.61 on August 19, 2015.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

50. The class period begins on February 12, 2014, when CaesarStone filed its Form 6-F reporting the results of the fourth quarter of 2013.

51. In its 2014 20-F, signed by Defendant Shiran, the Company claimed that the cost of quartz rose by only 4% in 2014, writing "[w]e do not have long-term supply contracts with our suppliers of quartz. The price of quartz was relatively stable during the last few years, but in 2014 and recently when renewing our annual supply terms for 2015 with certain Turkish quartzite suppliers, we experienced an increase of approximately 4% in quartzite prices each year, which we believe was driven by increasing global demand for quartz."

52. For the following reasons, the foregoing statement was materially false and misleading:

---

[3] The report, "Analysis of Countertop Materials," is appended to the Amended Complaint as Exhibit C.

(a) As described in ¶¶20-31 above, the Defendants knew or recklessly disregarded that the cost of quartz had actually risen by 19% in 2014, and not by 4% as they claimed.

(b) The 2012 price agreement between the Company and Mikroman, signed by Defendant Yos Shiran, states that in 2012 CaesarStone paid Mikroman $143 per ton of quartz. The 2014 price agreement, again signed by Defendant Shiran, shows an increase in the price of per ton of quartz of approximately 19%, to $170 per ton of quartz.

(c) The entirety of the 19% increase occurred in 2014. In the 2012 20-F, the Company states that "Mikroman has committed to supply us with quartzite at agreed upon prices through the end of 2013 and, thereafter, at prices that will be agreed upon based on then effective market prices through the end of 2014." Since the "agreed upon" cost per ton was $143 in 2012, then the cost per ton was $143 in 2013. Therefore the entirety of the $27 increase in price per ton occurred in 2014.

(d) Defendants acknowledged that the price of quartz had not risen in 2013, but had in 2014. During the Q1 2013 Earnings Call, an industry analyst asked if there were Defendant Shiran was asked if there were "any changes in raw material outlook." Defendant CEO Shiran responded that during the first quarter of 2013, "[i]n terms of raw materials, we don't see any major changes." The Company stated in its 2013 20-F that "the price of quartz was relatively stable during the last few years, but recently we have experienced an increase when renewing our annual supply contracts for 2014 with the Turkish quartzite producers given the increasing global demand for quartz." During the Q4 2013 Earnings Call Defendant Shiran stated "[a]s to raw materials, there is some increase in quartz prices. And from time-to-time, we didn't experience so much this year [2013] but in the past we experienced also a full year price

increase." During the same earnings call, CFO Averbuch acknowledged that prices had increased in 2014, stating that in 2014, "raw material price increases mostly in the quartz or due to the significant demand there are price increases."

(e) Defendants acknowledged that quartz prices had risen significantly in 2014, enough to affect margin. During the Q1 2014 Earnings Call, Defendant Averbuch stated that the "decrease in margin was driven [in part] by raw material price increases." Averbuch repeated this statement during the Q2 2014 Earnings Call, the Q3 2014 Earnings Call, and the Q4 2014 Earnings Call.

53. On May 8, 2014, CaesarStone filed a form 6-K and issued a press release announcing its Q1 2014 financial results. Defendant Shiran stated that the year-over-year decline in Q1 margins from 44.5% to 41.8% was driven by quartz price increases only "to a lesser extent."

54. On May 8, 2015, CaesarStone held its Q1 2014 Earnings Call, during which CFO Averbuch repeated this claim, stating that the decrease in margin was driven by higher quartz prices only "to a lesser extent."

55. On August 6, 2014, CaesarStone held its Q2 2014 Earnings Call, during which CFO Averbuch stated that this drove the decrease in margin, which suffered a year-over-year decline in Q2 margins from 49.8% to 41%, was affected by raw material price increases only "to a lesser extent."

56. On August 7, 2014, CaesarStone filed a form 6-K and issued a press release announcing its Q2 2014 financial results. CEO Shiran stated that the year-over-year decline in margins was driven by quartz price increases only "to a lesser extent, [by] raw material price increases…."

57. On November 5, 2014, CaesarStone filed a form 6-K and issued a press release announcing its Q3 2014 financial results. CEO Shiran stated that the lower margins, which suffered a year-over-year decline in Q3 from 44.5% to 43.7%, were affected by the rise in quartz prices only "to a lesser extent."

58. On November 9, 2014, CaesarStone held its Q3 2014 Earnings Call, during which CFO Averbuch repeated this claim, stating that the decrease in margin was driven by higher quartz prices only "to a lesser extent."

59. On February 12, 2015, CaesarStone filed a form 6-K and issued a press release announcing both its Q4 2014 and FY 2014 financial results. Again quoting Defendant Shiran, the Company downplayed the effect of the large, unacknowledged increase in the price of quartz on margins, and again failed to factor the 19% increase in quartz prices into its calculations, stating that margins were unchanged from the same quarter a year earlier due, "to a lesser extent, higher quartz prices," and stating that the price increase for quartz did not play a large role in the decline in margin for the entirety of 2014.

60. In its 2014 20-F, signed by Defendant Shiran, the Company provided reasons for reduced margins in 2014, but omitted any mention of the 19% increase in the price of quartz (or any increase). Instead, it states: "[i]n 2014, gross profit margins decreased mainly due to unfavorable exchange rates, increased IKEA business related to fabrication and installation activities, which comes with lower gross margin and a non-recurring $3.5 million credit to cost of revenues from 2013."

61. For the following reasons, the foregoing statements were materially false and misleading:

(a) As described in ¶¶32-42, above, the Defendants knew or recklessly disregarded that the cost of quartz had actually risen by 19% in 2014, and not 4% as claimed by Defendants, and thus knew or recklessly overstated their margins in each quarter of 2014 and for the entire year because they understated the cost of goods sold.

(b) By refusing to acknowledge or apply the true, 19% increase in quartz prices, to its financial statements, Defendants have necessarily overstated their margins for each quarter of 2014, and for the year 2014.

(c) Defendants repeatedly misstated the effect of the quartz price increase on margins, even though in the past they have acknowledged the deleterious effect of raw material costs on margins. For example, in its 2013 20-F, the Company stated that "our cost of sales and overall results of operations are impacted significantly by fluctuations in quartz prices."

66. Defendants have repeatedly claimed that their quartz products contain 93% quartz, and market their products as "premium" quartz products based on the high quartz content in their products. CaesarStone uses this alleged distinction to charge higher prices than its competitors. However, its products contain far less than 93% quartz, and no more quartz than its competitors' products.

67. The Company's 2014 20-F, signed by Defendant Shiran, states that the Company "seek[s] to position our products as a premium alternative to other surface materials and other quartz surfaces," and that "the perception among end-consumers of our products is a key competitive differentiator." Noting that competitors "set prices considerably lower than the prices of our premium products," CaesarStone acknowledges that it has "invested considerable resources to position our quartz surfaces as premium branded products." These exact statements are also found in the 2012 20-F and in the 2013 20-F, both signed by Defendant Shiran.

68. CaesarStone's "Technical Data Manual," a glossy, color publication available on its website, states plainly in its "Product Description" that "CaesarStone is 93% crushed quartz," and later that the "Sustainable Composition of Product" is "93% quartz."

69. CaesarStone's website states that "CaesarStone quartz surfaces are the ultimate combination of nature and technology. CaesarStone surfaces consist of 93% crushed quartz."

70. In a brochure prepared by the Company to boast of its "unique installation" at "Milan Design Week," CaesarStone again states that its products contain "93% quartz."

71. CaesarStone tells its distributors that its products contain 93% quartz, and the distributors tout the 93% quartz composition on their websites. Creative InCounters, an independent distributor of CaesarStone products, tells consumers to "choose CaesarStone" because "CaesarStone is 93% natural Quartz." Sunset Granite tells its customers to choose CaesarStone for the same reason. American Marble & Granite, Inc. says with regards to all thirty-six CaesarStone products it sells that they are "[c]omprised of 93% natural quartz." S&W Kitchens states twice that all CaesarStone countertops contain 93% quartz. Finally, the same is true of Stone LA's website, where the consumer learns that "CaesarStone Quartz Surfaces are manufactured to an exacting standard of excellence…. [and contain] 93% natural quartz aggregates to 7% pigments and polymer resins." The same claim regarding the 93% quartz composition can be found on the websites of T&J Granite Countertops, Ortega Kitchen and Bath, StoneOne Marble and Granite, The Kitchen Source, IST Granite, Carey Custom Floors, Marble Masters, Kitchen Designs, Inc., bobvila.com, and many others.

72. Ikea sells CaesarStone products. In a CaesarStone flyer prepared for Ikea entitled "10 Reasons to Choose CaesarStone," "CaesarStone is 93% natural Quartz" is listed as the reason for the product's "Natural Beauty."

73. For the following reasons, the foregoing statements were materially false and misleading:

(a) As described in ¶¶43-48, above, the Defendants knew or recklessly disregarded that their products contained materially less quartz than the 93% they claimed the products contained.

(b) Spruce Point purchased two separate samples of CaesarStone products directly from the Company, as well as materials from seven competitors, and submitted the samples for testing to Robert Horvath, Ph.D., of the Rutgers University Department of Materials Science & Engineering. Each sample was tested twice.

(c) The results of the testing, detailed in a report entitled "Analysis of Countertop Materials," revealed that CaesarStone's products contained far less quartz than advertised. Only one competitor's sample had a lower percentage of quartz than CaesarStone's products. The two CaesarStone products contained 88.69% and 89.41% quartz, nowhere near the Company's 93% claim.

**ADDITIONAL SCIENTER ALLEGATIONS**

74. CaesarStone CEO Yos Shiran took advantage of the artificially inflated stock price due to the failure to reveal the true price increase in quartz prices and the attendant overstatement of margins. During the class period he divested himself of millions of dollars worth of shares of CaesarStone stock. According to the 2013 20-F, in March of 2012, Shiran was granted options to purchase ordinary shares equal to 2% of the number of shares outstanding following the pricing of CaesarStone's IPO. The exercise price of the options was $11.00. In November of 2013 the exercise price was adjusted to $10.42. According to the 2013 20-F, as of

April 30, 2014, Defendant Shiran held 229,102 options which could be exercised at $10.42. The 2014 20-F states that Shiran exercised every one of these options before February 28, 2015.

75. The closing price of CaesarStone stock during this portion of the class period was $65.41 at the highest and $43.36 at the lowest. If Shiran exercised every option at lowest closing price of $43.36, he would have profited by $7,547,000. If he did so at the highest closing price of $65.41, he would have cashed out at $12,598,000. In either case, he materially benefitted from the artificially high stock price and avoided the losses that followed the publication of the Spruce Point report.

76. According to publicly filed documents, as well as the Spruce Point report, during the period when the Company was falsely stating that quartz prices had risen only 4% and overstating its margins, CaesarStone's largest shareholder, Sdot-Yam, took advantage of the artificially high stock prices and sold approximately $260 million worth of stock. On April 30, 2014, Sdot-Yam owned 51.15% of the common stock (17,765,000 shares). In fewer than nine months Sdot-Yam sold 6,325,000 of its shares, reducing its ownership to 32% of the common stock. Like Defendant Shiran, Sdot-Yam benefitted from the artificially high stock price and avoided the losses that followed the publication of the Spruce Point report. The publicly filed documents are the 2013 20-F; 2014 20-F; February 14, 2014 Schedule 13-G; May 28, 2014 Rule 424(b)(3) Prospectus; May 30, 2014 424(b)(7) filing; May 30, 2014 6-K; January 22, 2015 Schedule 13-G; Spruce Point Report

## LOSS CAUSATION/ECONOMIC LOSS

77. The market for CaesarStone securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and omissions as set forth above, CaesarStone securities traded at artificially inflated prices during the Class

Period. Lead Plaintiffs and other members of the Class purchased or otherwise acquired CaesarStone securities relying upon the integrity of the market price of CaesarStone securities and market information relating to CaesarStone, and have been damaged thereby.

78. During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of CaesarStone securities and operated as a fraud or deceit on Class Period purchasers of CaesarStone securities by misrepresenting the price it paid for raw materials, the cost of goods sold, by overstating its margins, and by falsely stating the percentage of quartz in its products. As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of CaesarStone securities fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of CaesarStone securities during the Class Period, Lead Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

79. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Lead Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about CaesarStone's business and operations. These material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of CaesarStone and its business and financial condition, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Lead Plaintiffs and other members of the Class purchasing CaesarStone securities at artificially

inflated prices, thus causing the damages complained of herein. When the true facts about the Company were revealed to the market, the inflation in the price of CaesarStone securities was removed and the price of CaesarStone securities declined dramatically, causing losses to Lead Plaintiffs and the other members of the Class.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

80. Lead Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired CaesarStone securities traded on NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

81. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, CaesarStone securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by CaesarStone or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

82. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

83. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

84. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of CaesarStone;
- whether the Individual Defendants caused CaesarStone to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of CaesarStone securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,
- whether the members of the Class have sustained damages and if so, what is the proper measure of damages.

85. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

86. Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- CaesarStone securities are traded in efficient markets;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on NASDAQ, and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

87. Based upon the foregoing, Lead Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

88. Alternatively, Lead Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

89. At all relevant times, the market for CaesarStone's common stock was an efficient market for the following reasons, among others:

(a) For all of the Class Period, CaesarStone shares of common stock traded on the NASDAQ;

(b) As a regulated issuer, CaesarStone filed periodic public reports with the SEC;

(c) CaesarStone regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

(d) During the Class Period, the average weekly trading volume in CaesarStone's shares was approximately 1,413,293.583 million shares. With a public float of approximately 34.99425913 million shares outstanding, approximately 4% of the float traded weekly, establishing a strong presumption that the market for its stock was efficient;

(e) New company specific information was rapidly reflected in the Company's stock price; and

(f) During the Class Period, as many as one hundred and twenty nine (129) market makers made a market in the Company's stock.

90. As a result of the foregoing, the market for CaesarStone's common stock promptly digested current information regarding CaesarStone from all publicly available sources and reflected such information in CaesarStone's stock price. Under these circumstances, all purchasers of CaesarStone's common stock during the Class Period suffered similar injury through their purchase of CaesarStone's common stock at artificially inflated prices, and a presumption of reliance applies.

## COUNT I

**(Against All Defendants For Violations of**
**Section 10(b) And Rule 10b-5 Promulgated Thereunder)**

91. Lead Plaintiffs repeats and realleges each and every allegation contained above as if fully set forth herein.

92. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

93. During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of CaesarStone securities; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire CaesarStone securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

94. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

influence the market for CaesarStone securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about CaesarStone's finances and business prospects.

95. By virtue of their positions at CaesarStone, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

96. Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of CaesarStone securities from their personal portfolios.

97. Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of CaesarStone, the Individual Defendants had knowledge of the details of CaesarStone's internal affairs.

98. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of CaesarStone. As officers and/or directors of a publicly-held company, the Individual Defendants

had a duty to disseminate timely, accurate, and truthful information with respect to CaesarStone's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of CaesarStone securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning CaesarStone's business and financial condition which were concealed by defendants, Lead Plaintiffs and the other members of the Class purchased or otherwise acquired CaesarStone securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

99. During the Class Period, CaesarStone securities were traded on an active and efficient market. Lead Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of CaesarStone securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of CaesarStone securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of CaesarStone securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

100. By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

101. As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

102. Plaintiffs repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

103. During the Class Period, the Individual Defendants participated in the operation and management of CaesarStone, and conducted and participated, directly and indirectly, in the conduct of CaesarStone's business affairs. Because of their senior positions, they knew the adverse non-public information about CaesarStone's misstatement of income and expenses and false financial statements.

104. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to CaesarStone's financial condition and results of operations, and to correct promptly any public statements issued by CaesarStone which had become materially false or misleading.

105. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press

releases and public filings which CaesarStone disseminated in the marketplace during the Class Period concerning CaesarStone's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause CaesarStone to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of CaesarStone within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of CaesarStone securities.

106. Each of the Individual Defendants, therefore, acted as a controlling person of CaesarStone. By reason of their senior management positions and/or being directors of CaesarStone, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, CaesarStone to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of CaesarStone and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

107. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by CaesarStone.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demands a trial by jury.

Dated: January 15, 2016

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
Michele S. Carino
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
mcarino@pomlaw.com
ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

**THE ROSEN LAW FIRM P.A.**
Phillip Kim
Laurence Rosen
275 Madison Avenue, 34th floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
pkim@rosenlegal.com
lrosen@rosenlegal.com

***Attorneys for Plaintiffs and***
***Proposed Co-Lead Counsel for the Class***