```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
                                                                      :
TAMMY TAPIA-MATOS,                                                    :
                                                                      :
                               Plaintiff,                             :      15-CV-6726 (JMF)
                                                                      :
            -v-                                                       :      OPINION AND ORDER
                                                                      :
CAESARSTONE SDOT-YAM, LTD., et al.,                                   :
                                                                      :
                               Defendants.                            :
                                                                      :
----------------------------------------------------------------------X
```

JESSE M. FURMAN, United States District Judge:

Defendant Caesarstone Ltd ("Caesarstone"), formerly known as Caesarstone Sdot-Yam, Ltd. (Docket No. 42), is an Israeli company that makes kitchen countertops and other surfaces out of quartz. In this putative securities fraud class action, investors allege that Caesarstone, acting in part through its Chief Executive Officer, Defendant Yosef Shiran, and its Chief Financial Officer, Defendant Yair Averbuch, made false and misleading statements and omissions regarding increases in the price of quartz and the quartz content of the company's products. Defendants now move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Amended Complaint. For the reasons that follow, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

## BACKGROUND

The following facts — which are taken from the Amended Complaint, documents it incorporates, and matters of which the Court may take judicial notice (including disclosure documents that Caesarstone was required by law to file, *see Silsby v. Icahn*, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014)) — are construed in the light most favorable to Plaintiffs. *See, e.g.,*

*Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013); *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009); *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).

Caesarstone is a public company, incorporated and headquartered in Israel and traded on the NASDAQ Global Select Market, that produces engineered quartz slabs that are used for countertops and other interior surfaces. (Am. Compl. (Docket No. 31) ("AC") ¶¶ 14, 18). Quartz is the primary raw material for Caesarstone's products. The company uses the term "quartz" in its disclosures, however, to refer collectively to "quartz, quartzite, and other dry minerals." (*See, e.g.*, Decl. of George T. Conway III (Docket No. 35) ("Conway Decl."), Ex. 8 ("2014 20-F"), at 8). Of those sub-categories of quartz, quartzite is the most significant, as it represents approximately 60% of the total quartz used by the company, and is contained in all of Caesarstone's products. (2014 20-F at 8). One key supplier in Turkey, Mikroman Madencilik San ve TIC.LTD.STI ("Mikroman"), provides a substantial portion of the company's supply of quartzite. (AC ¶ 21). In 2014, for example, Mikroman provided 46% of Caesarstone's total supply of quartzite. (*Id.*). The cost of quartz collectively accounted for about 31% of Caesarstone's raw material costs that year. (2014 20-F at 8). Caesarstone has acknowledged in public filings that increases in the cost of quartz could decrease gross profit margins. (*See, e.g.*, *id.* at 8).

On February 12, 2014, Caesarstone filed its Form 6-F, reporting its results for the fourth quarter of 2013, with the Securities and Exchange Commission ("SEC"). (AC ¶ 50). That report did not acknowledge any significant increase in the price of quartz or quartzite. (*See* Pls.' Mem. Opp'n Mot. Dismiss (Docket No. 38) ("Pls.' Opp'n") 7). But in the company's 2014 annual report, filed on March 12, 2015, and signed by Shiran, the company disclosed that, while "[t]he

price of quartz was relatively stable during the past few years," the company had "experienced an increase of approximately 4% in quartzite prices" in 2014.  (AC ¶ 51; 2014 20-F at 8).  During the same time period, Caesarstone "market[ed] itself as a producer of 'premium' quartz products" and "use[d] this alleged distinction to charge higher prices than its competitors."  (AC ¶ 43).  According to the Amended Complaint, "[o]ne of the ways in which CaesarStone brand[ed] itself as 'premium' [was] through the percentage of quartz in its products."  (*Id.* ¶ 44).  In filings with the SEC, the company claimed that its products contained "approximately 90% natural crushed quartz and approximately 10% polyester and pigments."  (*See, e.g.*, 2014 20-F at 36).  In various promotional materials, however, Caesarstone (or its distributors) touted the company's products as containing "93% quartz."  (AC ¶¶ 44-47, 68-72).

In August 2015, analyst firm Spruce Point Capital Management published a report claiming that Caesarstone had made various false and misleading statements to investors.  (*Id.* ¶ 49).  Only two are relevant here.  First, Spruce Point reported that it had tested two of Caesarstone's products and found that they contained only 88.69% and 89.41% quartz, "a lower percentage" than all but one (of seven) competitors' products and "nowhere near the 93% claim CaesarStone ma[de] to consumers."  (*Id.* ¶¶ 47-48).  Second, Spruce Point asserted that Caesarstone had experienced substantially higher increases in the cost of quartzite (and, by extension, quartz generally) than the company disclosed in its 2014 annual report.  (*See id.* ¶ 32-33).  In support of that allegation, Spruce Point relied on copies of the 2012 and 2014 supply agreements between Caesarstone and Mikroman, which indicated that the cost of quartzite from Mikroman alone increased by 19% over that two year period.  (*See id.* ¶ 24).

The day that Spruce Point published its report, the price of Caesarstone's stock fell $3.68 per share.  (*Id.* ¶ 49).  Thereafter, Plaintiff Tammy Tapia-Matos filed this lawsuit against

Caesarstone; Shiran, who served as the company's CEO and Executive Director at all relevant times; and Averbuch, who served as the company's CFO and Executive Director at all relevant times. In particular, the Amended Complaint (filed by a group appointed as Lead Plaintiffs (Docket No. 26)) alleges that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78(b), 78(t)(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240, by making false or misleading statements concerning (1) the degree to which quartz and quartzite prices increased in 2014; (2) the degree to which increases in quartz prices in 2014 affected the company's gross margins; and (3) the quartz content and premium quality of the company's products.

## LEGAL STANDARDS

"In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 319-20 (S.D.N.Y. 2012) (citing *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)). The Court will not dismiss any claims pursuant to Rule 12(b)(6) unless the plaintiff has failed to plead sufficient facts to state a claim to relief that is facially plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that is, one that contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). More specifically, a plaintiff must allege facts showing "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Further, if a plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [those claims] must be dismissed." *Id.* at 570.

Because they allege securities fraud, Plaintiffs must also satisfy the heightened pleading requirements of both Rule 9(b), which requires that the circumstances constituting fraud be "state[d] with particularity," Fed. R. Civ. P. 9(b), and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), which requires that scienter — that is, a defendant's "intention to deceive, manipulate, or defraud" — also be pleaded with particularity, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (internal quotation marks omitted). To satisfy Rule 9(b), a plaintiff "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). To satisfy the PSLRA, a complaint must, "'with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (quoting 15 U.S.C. § 78u-4(b)(2)(A)).

## DISCUSSION

Plaintiffs seek to hold Caesarstone, Shiran, and Averbuch liable for securities fraud under Section 10(b) and Rule 10b-5 and to hold Shiran and Averbuch liable as "control persons" under Section 20(a). To state a claim for relief under Section 10(b) and Rule 10b-5 (and, by extension, a claim under Section 20(a)), a plaintiff must plausibly allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 35-36 (2011) (internal quotation marks omitted); *see also, e.g.*, *SEC v. First Jersey Sec.,*

*Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) (noting that a plaintiff must plead a plausible primary violation of Section 10(b) to state a claim for control person liability under Section 20(a)).  Here, as noted, Plaintiffs allege three categories of misstatements: (1) that Defendants misrepresented the amount by which quartz and quartzite prices increased in 2014; (2) that, as a result, Defendants misrepresented the company's gross margins for 2014; and (3) that Defendants misstated the quality of, and percentage of quartz in, Caesarstone's products.  The Court begins with the last category and then turns to the other two, which are factually and legally intertwined.

**A.  Quartz Content and Product Quality**

Plaintiffs' allegations concerning the quartz content and quality of Caesarstone's products founder at the first step of the analysis as Plaintiffs fail to identify any actionable material misrepresentation or omission.  Liability under Section 10(b) "lies only to the extent that [a] statement was both objectively false and disbelieved by the defendant at the time it was expressed."  *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011); *see also City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 67-68 (2d Cir. 2012) (per curiam).  "A statement or omission is material if there is a substantial likelihood that a reasonable shareholder would consider in important in deciding how to act."  *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F. 3d 383, 389 (2d Cir. 2015) (internal quotation marks omitted); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (holding that an omission or misstatement is material if it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available").  Materiality "depends upon the context in which the statement was made," and takes into consideration the "total mix" of information available to a reasonable investor.  *Gross v. GFI Grp., Inc.*, — F. Supp. 3d. — , 2016 WL 719434, at *3 (S.D.N.Y. 2016).

Here, there are two fundamental problems with Plaintiffs' allegations. First, their claim is premised on Spruce Point's testing of only two Caesarstone products. (*See* AC ¶ 47). It is far from clear, however, that a sample size of two is statistically significant enough to draw conclusions about the quartz content and quality of Caesarstone's products generally. Second, Plaintiffs' claims relate solely to promotional materials, some of which were not even prepared by Defendants, targeted at consumers rather than the company's disclosures to investors. (*See id.* ¶¶ 45-46). But Defendants cannot be held liable for statements that they themselves did not make. *See, e.g.*, *Janus Capital Grp. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) ("One 'makes' a statement by stating it. . . . For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right."); *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 264-65 (2d Cir. 1993) (affirming the district court's dismissal of allegedly fraudulent statements that were unattributed to a particular speaker, even though the plaintiff "allege[d] on information and belief that the unattributed statement was made by an agent of the defendant"); *In re Gaming Lottery Sec. Litig.*, No. 96-CV-5567 (RPP), 1998 WL 276177, at *6 (S.D.N.Y. May 29, 1998) ("[C]orporate defendants cannot be held liable for overly optimistic statements in analysts' articles that are not attributed to specific corporate agents."). And as the Second Circuit has made clear, SEC filings and documents distributed to shareholders are more significant than "[c]orporate documents that have not been distributed to the shareholders," which should "rarely be considered part of the total mix of information reasonably available" to shareholders. *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993); *see id.* (holding that, although information "widely reported in readily available media" may be

included in the "total mix" of information, "the mere presence in the media of sporadic news reports does not give shareholders sufficient notice that proxy solicitation statements sent directly to them by the company may be misleading"); *see also, e.g.*, *Koppel v. 4987 Corp.*, 167 F.3d 125, 131-32 (2d Cir. 1999). Here, there is no dispute that, in its annual SEC filings, the company consistently told investors that its products contained "approximately 90% natural crushed quartz." (*See, e.g.*, Conway Decl. Ex. 7 at 33). And wisely, Plaintiffs do not argue, or even suggest, that those statements were false or misleading, let alone materially so, since 88.69% and 89.41% are "approximately" 90%.[1]

Feebly, Plaintiffs ask the Court to ignore Defendants' truthful disclosures in their SEC filings and allow them to pursue a claim based on the promotional materials alone because, as a foreign company, "Caesarstone does not file quarterly reports, and there are far fewer data points available to analysts and investors than [for] public companies in the United States." (Pls.' Opp'n 15). That may be true, but it does not provide a reason to discount, let alone ignore, Defendants' disclosures in the company's annual reports. In fact, if anything, Plaintiffs' argument cuts the other way. That is, the fact that Caesarstone made fewer disclosures to investors would mean that the disclosures it did make would have been given greater, not lesser, weight by a reasonable investor. In any event, Plaintiffs provide neither logical nor legal support for the proposition that a few general statements appearing in promotional materials should be given a place of greater prominence over disclosures contained in annual reports when evaluating the "total mix" of information available to investors. The Court therefore concludes

---

[1] Even if Plaintiffs could rely on the promotional materials in the face of Caesarstone's SEC disclosures, it is not clear that they would plead a plausible claim. As Defendants point out, the company's website and other promotional materials state in various (if not most) places that the company's products consist of "up to 93% quartz." (*See* Defs.' Mem. 15-16; Conway Decl., Exs. 33-35). There is no allegation that such statements were false or misleading.

that, even assuming *arguendo* that the scattered statements in promotional materials identified by Plaintiffs were arguably false or misleading in isolation given the results of Spruce Point's product testing, any misrepresentations made in those statements were immaterial because no reasonable investor would consider them to have meaningfully altered the "total mix" of information available.

Plaintiffs alternatively argue that they adequately plead that Caesarstone's description of its products as "premium" was misleading because the company's products contain less quartz than the tested products of all but one of its competitors. (*See id.* 15-16). Again, Plaintiffs allegations stumble out of the gate by assuming that tests conducted on two product samples can support broad inferences about the quartz content of Caesarstone's products generally. In addition, Plaintiffs provide no support for their assertion that a product's "premium quality" is tied directly, let alone primarily, to the product's quartz content. Without support for that link, the fact that the quartz content of Caesarstone products may not have been greater than the quartz content of its competitors' products does not plausibly support the conclusion that Caesarstone's representations regarding the "premium quality" of its products were materially misleading. Accordingly, Plaintiffs' Section 10(b) claims based on alleged misrepresentations about the premium quality and quartz content of Caesarstone's products must be and are dismissed.

**B. The Price of Quartz and Gross Profit Margins**

By contrast, Plaintiffs first allegations — concerning Defendants' statements about the increase in the price of quartz in 2014 — are sufficient to state a claim under Section 10(b) and Rule 10b-5. In its 2014 Annual Report, Caesarstone reported that the "price of quartz was relatively stable during the last few years, but in 2014 and recently when renewing our annual supply terms for 2015 with certain Turkish quartzite suppliers, we experienced an increase of

approximately 4% in quartzite prices each year." (AC ¶ 51; 2014 20-F at 8). As Plaintiffs point out, however, agreements between Caesarstone and Mikroman — which provided Caesarstone with approximately 55% of its quartzite in 2012, 48% in 2013, and 46% in 2014 (*see* AC ¶ 21), making it the company's largest supplier by significant margins — reveal that the prices Mikroman charged Caesarstone for quartzite (which made up about 60% of Caesarstone's total quartz supply at the time) increased by approximately 19% between 2012 and 2014 (*see* AC, Exs. A-B; Conway Decl., Exs. 3-4). To be sure, Plaintiffs overstate their case in contending that *all* of that 19% increase occurred in 2014, as there are reasons to believe some of it took place in 2013. (*See* Defs.' Mem. Supp. Mot. Dismiss ("Defs.' Mem.") (Docket No. 13) 12-13; Defs.' Reply Mem. Supp. Mot. Dismiss ("Defs.' Reply") (Docket No. 39) 2-3).[2] But given Caesarstone's own statements — that the "price of quartz was relatively stable" in the "few years" before 2014 (AC ¶ 23) and that the company "didn't experience so much" of an increase in quartz costs in 2013 (AC ¶ 27) — not to mention the lack of any reference to price increases in the company's 2013 Annual Report, an inference can be drawn (and thus must be drawn, *see Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)) that the price increase in 2014 was substantially greater than Defendants asserted in the 2014 Annual Report. Such a

---

[2]     Plaintiffs may well overstate their case in other ways as well. For example, as Defendants note, Plaintiffs repeatedly blur the distinction between quartz and quartzite and include no allegations concerning the price of quartz or quartzite from suppliers other than Mikroman. (*See* Pls.' Opp'n 6-7). Even with those flaws, however, Plaintiffs' allegations are sufficient to survive Defendants' motion to dismiss. Among other things, the alleged misrepresentation in the 2014 Annual Report was specific to the price of quartzite itself, and quartzite comprised approximately 60% of the company's quartz supply at the time. (*See* 2014 20-F at 8). And while Mikroman was only one of Caesarstone's suppliers, it was the company's largest supplier of quartzite in 2014. (*See* AC ¶ 21). It is hard to imagine that the company would have continued purchasing nearly half of its quartzite from Mikroman if Mikroman's price increases were materially different from the price increases of Caesarstone's other suppliers.

misstatement could plainly qualify as material.  *See, e.g.*, *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) ("[A] complaint may not properly be dismissed under Rule 12(b)(6) on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." (internal quotation marks omitted)).

Because Plaintiffs adequately alleged that Defendants concealed significant increases in the price of raw materials, they plausibly allege that, as a result, Defendants also misrepresented the true extent to which those price increases impacted the company's margins.  In particular, Plaintiffs point out that Caesarstone told investors that, based on the inaccurate 4% figure, the increase in quartz prices affected margins only "to a lesser extent."  (*See* AC ¶¶ 32-42). Defendants' arguments to the contrary are largely derivative of its arguments concerning the price increase itself, which the Court has already addressed.  The only additional argument Defendants make draws on *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir. 1996), which held that an "unsupported general claim of the existence of confidential company" reports that would contradict public statements is not enough to survive a motion to dismiss.  (*See* Defs.' Mem. 14-15).  Here, however, Plaintiffs do not rely on allegations regarding the existence of unspecified company documents; they rely on actual contracts and public statements.  (*See* AC, Exs. A-B; Conway Decl., Exs. 3-4). Accordingly, the Court concludes that Plaintiffs adequately allege that Defendants materially overstated the company's gross margins as well.

Defendants' only other argument for dismissal of Plaintiffs' claims concerning the price increases and profit margins — that Plaintiffs fail to adequately plead scienter (*see* Defs.' Mem.

11

17) — is easily rejected. To prove a violation of Section 10(b) and Rule 10b-5, a plaintiff must plead and prove that a defendant acted either with the intent "to deceive, manipulate, or defraud," *Tellabs*, 551 U.S. at 313 (internal quotation marks omitted), or with "recklessness," which is defined as "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (internal quotation marks omitted); *see also, e.g.*, *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2003). Plaintiffs' allegations regarding Defendants' statements concerning the price increases and gross margins satisfy those standards. Among other things, a strong inference of scienter can be inferred where a plaintiff "specifically allege[s] defendants' knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308. Here, the Mikroman contracts — which form the basis of Plaintiffs' allegations regarding the price increases and gross margins — were signed by Defendant Shiran. That suggests direct knowledge of the actual price increase of quartzite, which in turn gives rise to a strong inference of scienter. *See, e.g.*, *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 616 (S.D.N.Y. 2015); *Ark. Teacher Ret. Sys. v. Bankrate Inc.*, 18 F. Supp. 3d 482, 486 (S.D.N.Y. 2014).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. In particular, Plaintiffs' claims concerning Defendants' statements regarding the quartz content of Caesarstone's products are dismissed for failure to plausibly allege a material misstatement or omission. By contrast, Plaintiffs' claims concerning Defendants' statements regarding the price increase for quartz and gross margins survive.

The Clerk of Court is directed to terminate Docket No. 33.

SO ORDERED.

Date: July 20, 2016
New York, New York

JESSE M. FURMAN
United States District Judge